CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

APR 1 2020

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

PATRICIA M.,[1]                    )
                Plaintiff,         )        Civil Action No. 4:18-cv-00060
                                   )
v.                                 )        REPORT & RECOMMENDATION
                                   )
COMMISSIONER OF SOCIAL             )        By:    Joel C. Hoppe
SECURITY,                          )               United States Magistrate Judge
                Defendant.         )

Plaintiff Patricia M. asks this Court to review the Commissioner of Social Security's final

decision denying her application for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C.

§ 636(b)(1)(B). ECF No. 11. Having considered the administrative record, the parties' briefs, and

the applicable law, I find that the Commissioner's final decision is supported by substantial

evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 426.920(a)(4).[2] The claimant

bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden

shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In October 2014, Patricia filed for DIB alleging that she had been unable to work since

January 23, 2013, because of fibromyalgia, dizzy spells, migraine headaches, and hypertension.

*See* Administrative Record ("R.") 49, 134, 223–29, ECF No. 9-1. Patricia was fifty-five years

old, or a "person of advanced age" under the regulations, on her alleged onset date. R. 134; 20

C.F.R. § 404.1563(e). Disability Determination Services ("DDS"), the state agency, denied her

claim initially in September 2015, R. 134–46, and upon reconsideration that December, R. 147–

60. On May 9, 2017, Patricia appeared with counsel and testified at an administrative hearing

before ALJ Stephanie Nagel. *See* R. 64–133. A vocational expert ("VE") also testified at this

hearing. R. 102–29.

ALJ Nagel issued an unfavorable decision November 28, 2017. R. 49–59. She first found

that Patricia had consistently worked part-time as a school-bus aide since January 2013, but that

her earnings were not high enough for the work to qualify as "substantial gainful activity." R. 51;

*see* R. 72–74. At step two, ALJ Nagel found Patricia had "the following severe impairments:

osteoarthritis of the left knee, headaches, gout, fibromyalgia, and vertigo." R. 51. Her diagnosed

generalized anxiety disorder was a nonsevere impairment because it caused only "mild"

limitations in "concentrating, persisting, or maintaining pace" and no limitations in any other

area of mental functioning. R. 52–53. Patricia's severe impairments did not meet or medically

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

equal the relevant Listings. *See* R. 53–54 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 2.07,

14.09). ALJ Nagel then evaluated Patricia's residual functional capacity ("RFC") and found she

could perform "a range of light work"[3] that involved "occasional exposure to hazards," stooping,

kneeling, crouching, crawling, and climbing stairs or ramps, but never climbing ladders, ropes,

and scaffolds. R. 54. Based on this RFC finding and the VE's testimony, ALJ Nagel concluded at

step four that Patricia was not disabled after January 2013 because she could return to her past

relevant work as a customer-service representative or bank-vault teller as Patricia had performed

those jobs or as a school secretary, either as actually performed or as generally performed in the

economy. R. 58–59; *see* R. 103–08, 110–12. ALJ Nagel did not reach an alternative conclusion

about whether Patricia could transition other work that offered a significant number of jobs in the

national economy given her age, RFC, and work history. *See* R. 59, 111–29.

### III. Discussion

Patricia's arguments challenge ALJ Nagel's RFC determination, particularly her

conclusion that Patricia's fibromyalgia and vertigo were not as functionally limiting as she and

one of her treating physicians claimed. *See generally* Pl.'s Br. 5–10, ECF No. 15. A claimant's

RFC is her "maximum remaining ability to do sustained work activities in an ordinary work

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); *see* R. 110. A person who can meet these relatively modest strength requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 110. Someone who can perform light work can also do "sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools," 20 C.F.R. § 404.1567(a), and typically requires sitting for about six hours and standing and/or walking for about two hours throughout a normal eight-hour workday, *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

setting" for eight hours a day, five days a week despite her medical impairments and symptoms.[4]

SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding

"made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v.*

*Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly

established "restrictions caused by medical impairments and their related symptoms" that affect

the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996

WL 374184, at *1, *2. *See Mascio*, 780 F.3d at 637–40; *Reece v. Colvin*, 7:14cv428, 2016 WL

658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17,

2016). The ALJ has broad discretion to decide whether an alleged symptom or limitation is

supported by or consistent with other relevant evidence, including objective evidence of the

underlying medical impairment, in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v.*

*Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing

*Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm

the ALJ's RFC findings when she considered all the relevant evidence under the correct legal

standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and

built an "accurate and logical bridge from that evidence to h[er] conclusion[s]," *Woods v.*

*Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th

---

[4] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. § 404.1502(i).
The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment.
*See Lewis*, 858 F.3d at 865–66. "First, the ALJ looks for objective medical evidence showing a condition
that could reasonably produce," *id.* at 866, the actual pain or other symptoms "in the amount and degree[]
alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the
claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the
claimant's symptoms to determine the extent to which they limit [her] ability," *Lewis*, 858 F.3d at 866, to
work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). "The second
determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and
their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866;
*see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565.

Cir. 2019).

A.    *Summary*

    *1.    Relevant Evidence*

Patricia claims she was disabled during the relevant time because fibromyalgia, migraine headaches, and vertigo caused persistent pain, dizziness, and fatigue that severely restricted her capacities to sit, stand, walk, lift/carry, assume certain postures (e.g., stooping, crouching), remember things, and complete daily activities on a regular and continuing basis. *See generally* R. 81–98, 129–31, 138–39, 280–81, 357–58. The headaches and dizziness started on October 17, 2013, after she fell from a ladder and hit her head on a concrete floor while she was working at Dollar Tree. R. 83; *see* R. 383, 388, 417, 483.

On October 24, Patricia followed up with her longtime primary-care physician, Paul Buckman, M.D., in connection with her workers' compensation claim. R. 483–85; *see* R. 231–39, 380. She reported dizziness, headaches, nausea, and vomiting. R. 483. Dr. Buckman noted that Patricia endorsed neck and thoracic spine tenderness on exam, but she exhibited a normal gait and endorsed no tenderness in her shoulder, elbow, wrist, hip, knee, or ankle joints. R. 484. He diagnosed postconcussion syndrome and told Patricia to remain off work. R. 485. On November 11, Patricia reported continued pain and dizziness, R. 480, but relevant findings on her physical exam were normal, R. 481. Dr. Buckman prescribed valium and kept her out of work while she "continue[d] therapy." R. 482. Three weeks later, she reported "some dizziness" and "memory problems," R. 476, but "no fatigue," headache, or weakness, R. 477. Her physical exam was completely normal. R. 477. On December 23, Dr. Buckman said they would discuss at the next visit whether Patricia could work as a bus aide while on medical leave from Dollar Tree. R. 475; *see* R. 478.

In January 2014, Patricia reported nausea, dizziness, and weakness, R. 466–67, 470–71,

but denied fatigue and headaches, R. 467. Her physical examinations were still normal. R. 467,

471. Dr. Buckman ordered an MRI of her brain, increased her valium to every four hours as

needed, and added Phenergan for nausea. R. 468, 471–72. The MRI showed "no evidence of

acute ischemic change . . . , abnormal mass effect, [or] acute or chronic hemorrhage." R. 392. Dr.

Buckman referred Patricia to neurologist Zulfiqar Turk, M.D., to evaluate her postconcussion

syndrome and continued symptoms. *See* R. 380, 468, 388–90.

Patricia saw Dr. Turk on February 4, 2014. R. 388–90. She reported episodic vertigo

when turning her head or bending down, "severe dizziness," headaches, nausea, and "unsteady

balance." R. 388; *see* R. 468. The vertigo and dizziness improved shortly after her fall, but they

had now progressed to the point that she "cannot function" enough to perform "activities of daily

living." R. 388. Dr. Turk observed that Patricia exhibited "varying degrees of gait ataxia[,] but

did not fall" and had "[n]o focal weakness or cranial nerves deficits." R. 389. He diagnosed

"factitious disorder versus malingering" and noted Patricia may have an "underlying psychiatric

disorder" that should be evaluated. *Id.* "Her symptoms could be consistent with concussion," but

the "varying degrees of gait ataxia" could not be explained from a neurophysical standpoint. R.

389–90; *see* R. 390 ("No restriction in terms of work."). Patricia was "very upset" with that

conclusion. R. 390; *see also* R. 380 (letter from workers' compensation claims adjuster noting

that Patricia's behavior during Dr. Turk's examination "had the doctor so upset" that he almost

did not file a report and that the insurance company "had a nurse there who stated she 'had never

seen anything like it'").

Patricia returned to Dr. Buckman's clinic a few days later seeking a "second opinion"

about her condition. R. 463. She still felt dizzy when looking up or bending over, *id.*, but she

denied fatigue, headaches, and weakness, R. 464. Her physical examination was completely

normal, including normal gait and no joint tenderness in her neck, back, shoulders, elbows,

wrists, hips, knees, or ankles. *Id.* Dr. Buckman cleared Patricia to go back to "light duty" work

that did not involve climbing, "lifting up," or "lifting over 10 lbs." R. 465. Patricia "did not do

well" when she went back to Dollar Tree. R. 460. She was assigned to the register, where she

had to stay "stationary for 2–3 hours" at a time, causing her to experience headache, nausea, and

upset stomach. *Id.* She still felt dizzy if she bent her head backwards. *Id.* Patricia noted she could

not "tolerate 17–20 hours of work," R. 460, but she denied generalized fatigue, headache,

dizziness, or weakness, R. 461. Her neurophysical exam was normal except for "some

nystagmus with right lateral gaze[,] not worsened with bending over." R. 461. Dr. Buckman said

Patricia could return to work, but she should take a ten-minute break every two hours. R. 462.

On March 20, 2014, Patricia saw neurologist Victor Owusu-Yaw, M.D., to get a second

opinion for her workers' compensation claim. R. 383–87; *see* R. 375, 462. She reported having

"[h]eadaches about once or twice a week," which manifested as "sharp, shooting, electrical" pain

"predominately in the left occiput." R. 383. In January, she "started having dizzy spells" where

she felt uncoordinated, "off balance, nauseated," and woozy for "a couple of minutes" after

"looking up or bending over." *Id.*; *see also* R. 457 ("[S]till dizzy with bending over."). She also

complained of neck stiffness, diffuse joint pain, fatigue, "and memory and concentration

difficulties since the fall." R. 383. *But see* R. 458 (Dr. Buckman's "brief review of systems"

showing Patricia reported no fatigue, headache, dizziness, or weakness on March 24). She was

"working light duty four to five hours a day," which she planned to "continue pending benefits"

of Dr. Owusu-Yaw's treatment plan, R. 385, including a trial of Neurontin in lieu of occipital

nerve blocks, R. 384. Patricia's neurophysical exam was normal, with no evidence of impaired

concentration, memory disturbance, nystagmus, gait or coordination problems, or diminished sensation or reflexes. R. 384; *see also* R. 458 (normal gait and no joint tenderness on March 24). She also had normal range of motion and "full strength throughout with normal tone and bulk." R. 384. Dr. Owusu-Yaw ordered an EEG, which was normal. R. 375–76, 379. A vestibular diagnostic procedure showed normal caloric, tracking, and saccade testing, but "[a]bnormal [p]ostural testing." R. 387. Dr. Owusu-Yaw recommended "right repositioning . . . for positional vertigo." *Id.*

On April 16, Patricia reported her headaches were "better" on Neurontin. R. 377. Her neurophysical exam was still normal. *Id.*; *see also* R. 406–07, 410–12 (emergency room records dated May 2 and May 12, 2014, documenting normal neurophysical exam, including no motor or sensory deficits, no extremity tenderness or muscle weakness, full range of motion in all extremities, and normal ambulatory status); R. 455 (normal gait and no joint tenderness on April 25). Dr. Owusu-Yaw ordered another MRI of her brain, R. 376, which was "stable" and showed "[n]o evidence of recent infarction. . . [or] abnormal intracranial enhancement." R. 373. *See* R. 369. That June, Patricia told Dr. Owusu-Yaw that her headaches had improved and she "learn[ed] to get up and move slowly" to deal with her positional dizzy spells. R. 369; *see also* R. 451. Dr. Owusu-Yaw's normal findings on the detailed neurophysical exam were unchanged. R. 370; *see also* R. 452 (normal gait and no joint tenderness on May 28). He opined that Patricia had "reached maximal medical improvement." R. 370. At the time, she was still "working light duty" at Dollar Tree on a part-time basis. *See* R. 453–54. She also drove a school bus. R. 370; *see* R. 459 (Dr. Buckman noting on March 24 that Patricia was "slowly improving," it was "OK to work on [the] bus," and she should "continue light duty work at Dollar Tree"); R. 453 (Dr.

Buckman noting on May 28 that "stress conditions at Dollar Tree may be hindering [her] recovery" and "discuss[ing] the possibility of leaving work").

Patricia continued under Dr. Buckman's care for the rest of the relevant period. *See generally* R. 439–50 (July 2014–Mar. 2015); R. 498–520 (July–Nov. 2015); R. 564–71 (Dec. 2015, Feb. 2016); R. 436–61 (May 2016–Jan. 2017); R. 593–99 (Apr. 2017). Patricia often presented with "no fatigue, . . . . no headache, no dizziness, [and] no weakness." R. 440, 443, 446, 518, 537, 542, 546, 554, 557, 564–65, 569; *see also* R. 448–50, 513–15 (no relevant symptoms recorded in July 2014, July 2015, and November 2015). *But see* R. 544–46 (reporting both "headache" and "no headache" in September 2016); R. 563–64 (reporting both "vertigo" and "no dizziness" in February 2016). Dr. Buckman's findings on Patricia's contemporaneous neurophysical exams were almost always unremarkable, including that she exhibited a normal gait and no joint tenderness in the neck, back, shoulders, elbows, wrists, hips, knees, or ankles. *Compare* R. 440–41, 443, 446, 449, 464, 514, 518–19, 537, 542, 546, 550, 554, 561, 564–65, 569, *with* R. 500, 557, 568–70 (noting knee joint tenderness).

In January 2015, Patricia reported that she "hurt[] from head to toe," but she continued to deny fatigue, headaches, dizziness, and weakness. R. 442, 443. She still worked as an aide on the school bus and was "walking some" for exercise. R. 442. Her neurophysical exam was normal. R. 443. Dr. Buckman diagnosed "[m]uscle pain: chronic, not controlled," and added meloxicam to the oxycodone-acetaminophen that Patricia took "every 6 hours as needed" for pain. R. 443–44. Patricia reported "no problems" at a work-related physical exam on July 8, 2015. R. 517, 518 ("No fatigue, . . . no headache, no dizziness, no weakness."). Around the same time, she told DDS that her whole body "hurt all the time," she was always exhausted, and she got "headaches a lot from being dizzy." R. 280–81 (June 3, 2015). She walked "[a]bout a mile" every day and

10

could do household chores if she stopped to rest. *Id.* In August, Patricia saw Dr. Buckman for

acute bronchitis with fatigue, headache, and muscle aches. R. 509. On October 8, she returned

primarily complaining of left knee pain and swelling, R. 503, and Dr. Buckman noted consistent

findings on that day's exam, R. 505 (abnormal gait, knee joint tenderness, slight swelling, and

warmth). Patricia also reported fatigue, but she denied headaches, dizziness, and weakness. R.

504. Dr. Buckman diagnosed drug-induced gout of the left knee. *Id.*

On May 27, 2016, Patricia told Dr. Buckman that she constantly "hurt[] from head to toe"

and was fatigued. R. 559. She denied headache, dizziness, and weakness. R. 560. Dr. Buckman's

findings on exam were normal again, including normal gait and no joint tenderness in the neck,

back, shoulders, elbows, wrists, hips, knees, or ankles. R. 561. He diagnosed fibromyalgia and

prescribed Cymbalta. R. 561–62. When Patricia said she was "unable to take Cymbalta," R. 556,

Dr. Buckman switched her to Effexor, R. 558, and then added Remeron, R. 550. In August 2016,

Patricia reported exhaustion, headaches, and feeling dizzy if she turned her head too fast, R. 548,

but she denied fatigue, headaches, dizziness, and weakness at her next visit in January 2017, R.

537. Her physical exams were normal. R. 537, 550 (normal gait, no joint tenderness).

On April 10, 2017, Dr. Buckman completed a Fibromyalgia RFC Questionnaire for

Patricia. R. 593–99. He diagnosed her with fibromyalgia as evidenced by a "weak grip" and

tenderness in her joints and muscles. R. 593. Her symptoms included "multiple tender points,"

chronic fatigue, muscles weakness, "frequent, severe headaches," "vestibular dysfunction," and

"constant pain" in her neck, back, shoulders, arms, hips, thighs, knees, ankles, and feet. R. 593,

594; *see also* R. 599. Dr. Buckman opined that Patricia was "incapable of even 'low stress'

jobs," and her pain was severe enough that it would "constantly" interfere with "attention and

concentration" needed to do simple work tasks. R. 594. Even if she could work, she could only

stand for ten minutes and sit for five minutes before changing positions, which she needed to do at will. R. 596. She needed to get up and walk around for five minutes at least twice every hour, but she could only sit and stand/walk for "less than 2 hours" total during an eight-hour workday. *Id.* She would need to take unscheduled breaks every fifteen minutes, but she did not need to lie down during those breaks. *Id.* Dr. Buckman also opined that Patricia could not lift even "less than 10 pounds," and could never twist, stoop (bend), crouch/squat, climb stairs, or look down. R. 597. She could "rarely" turn her head left or right, look up, and hold her head in a static position. *Id.* Finally, Dr. Buckman opined that Patricia could use her hands for 10 percent of the day and use her arms to reach for 20 percent of the day. *Id.* The symptoms and limitations Dr. Buckman identified on this questionnaire dated to 2009, at the earliest. R. 598.

In May 2017, Patricia testified that she could not work on a regular and continuing basis because fibromyalgia caused "constant pain" that impacted nearly every aspect of her life. R. 81–82; *see also* R. 84 ("I was always in pain and I couldn't really find a job that I could do that I wasn't in pain."). She still had dizziness resulting in "frequent falls" and had migraine-type headaches "two or three times a week." R. 85; *see* R. 93. She took Percocet or ibuprofen every day for her fibromyalgia and headache pain. R. 92–93. Patricia didn't do much housework anymore because it hurt too much to stand and she got "really dizzy" if she bent over. R. 86. *But see* R. 90 ("I stay dizzy all the time."); R. 93 ("I never know when [dizziness] is going to come on. It can hit me at any time."). The dizzy spells lasted "until the room stop[ped] spinning," usually five to ten minutes. R. 94. Patricia could stand for at most ten minutes, sit for fifteen or twenty minutes, and walk "probably half a city block" before needing to sit. R. 95–96. She sat "most of the time" while working as an aide on the school bus, R. 97, which she did for 90 minutes in the morning and 90 minutes in the afternoon five days a week during the academic

year, R. 72. Patricia was primarily responsible for watching students with physical disabilities

"to make sure that they [were] not having any issues or problems." R. 73.

> 2.    *The ALJ's Decision*

ALJ Nagel discussed this and all the other relevant evidence in her written decision. *See*

R. 51–59. At step two, she found that Patricia's gout, headaches, fibromyalgia, and vertigo were

"severe" medically determinable impairments because they "significantly limit[ed]" her ability to

do basic work activities, R. 51, which, according to the regulations, include physical functions

like "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," 20

C.F.R. § 404.1522(b)(1). *See also* R. 53–58. These impairments did not meet or equal their

corresponding Listings, however, because Patricia could sustain "a reasonable walking pace over

a sufficient distance" to complete her daily activities and she did "not have frequent attacks of

balance disturbance, . . . with disturbed function of vestibular labyrinth demonstrated by caloric

or other vestibular tests." R. 53. (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 2.07, 14.09).

Turning to Patricia's RFC, ALJ Nagel explained the weight she afforded to all the

medical evidence in the record, including the objective findings on neurophysical exams and

diagnostic tests, various physicians' conflicting medical opinions, the type of treatment Patricia

received for her conditions, and Patricia's statements both to her doctors and to the agency. *See*

R. 54–59. She found that Patricia's impairments could reasonably be expected to cause "constant

pain," impaired memory, persistent fatigue, "frequent falls, dizziness, and migraines," R. 54, but

that her statements describing the "intensity, persistence[,] and limiting effects of these

symptoms [were] not entirely consistent with the medical and other evidence . . . for the reasons

explained in th[e] decision," R. 55. First, Patricia made inconsistent statements in connection

with her DIB claim. In May 2017, she testified that she could "drive two [or] three times a week

to appointments or for errands" and that "since 2013" she had "work[ed] as a part-time bus aide, three hours a day" five days a week. *Id.* In June 2015, "[s]he wrote in her fatigue questionnaire that she could walk a mile." *Id.* (citing R. 280). Second, Patricia's "reports of intense pain and dizziness [were] not supported by the consistently normal clinical findings and conservative treatment," which was limited to medication, documented throughout her record. *Id.*; *see* R. 55–57. Those allegations also conflicted with Dr. Buckman's clinic notes, which showed Patricia routinely "denied any fatigue, headache, dizziness, or weakness." R. 55; *see also* 55–57. Finally, Patricia's reported daily activities, including occasionally driving and walking a mile for exercise, and her "employment as a part-time bus aide demonstrate[d] her ability to sit and focus her attention for . . . at least 1.5 hours at a time," which undermined her testimony that she could not stand, sit, or walk for more than twenty minutes before her whole body hurt. *See* R. 57–58.

ALJ Nagel gave "little weight" to Dr. Buckman's Fibromyalgia RFC questionnaire because, while Patricia complained of "swelling, fatigue, and weakness," the "consistently normal" findings on her physical exams, including "no tenderness, a normal gait, and normal strength, [did] not support the extreme limitations" Dr. Buckman identified. R. 57; *see also* R. 55–57. Those limitations were also inconsistent with the "conservative nature" of Patricia's pain-management regimen and her reported activities of daily living. R. 57. ALJ Nagel gave "little weight" to the opinions from the DDS physicians who reviewed Patricia's records in late 2015. R. 58. Both physicians opined that Patricia could do "medium exertion"[5] work and need only be limited (at most) to "frequently climbing ramps and stairs, kneeling, crouching, and crawling"

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," 20 C.F.R. § 404.1567(c), plus standing, walking, and/or sitting for about six hours in an eight-hour workday, SSR 83-10, 1983 WL 31251, at *6. *See* R. 142, 154–55. A person who can do "medium" work can also do less-demanding "light" work. 20 C.F.R. § 404.1567(c).

and "occasionally climbing ladders, ropes, and scaffolds." *Id.* (citing R. 142, 154–55). They did

not put any restrictions on her workplace environment. R. 142, 154–55. ALJ Nagel "further

limited" Patricia to "light exertion work" that involved only "occasional exposure to hazards"

and most postural activities, R. 54, in order to accommodate her "subjective allegations of

dizziness and pain," R. 58 *See* R. 56, 58.

B.    *Analysis*

Patricia challenges ALJ Nagel's reasons for giving Dr. Buckman's medical opinion "little

weight," *see* Pl.'s Br. 5–8, 9–10, as well as the fact that the ALJ's RFC finding does not include

other (but unspecified) limitations reflecting Patricia's "vertigo, symptomized by the room

spinning," or "difficulty with balancing," *id.* at 9. Her objections are not persuasive.

To start, ALJ Nagel explained that she limited Patricia to light work involving only

"occasional"[6] exposure to hazards, stooping, kneeling, crouching, crawling, and climbing stairs

or ramps, and no climbing ladders, ropes or scaffolds—restrictions neither DDS physician

thought were necessary—specifically to accommodate Patricia's credible "subjective allegations

of dizziness," R. 58; *see* R. 54, 142, 155. She also explained that Patricia's testimony describing

more "frequent" and "intense" vertigo and dizzy spells, R. 54, 55, contradicted specific medical

exhibits showing Patricia did "not have frequent attacks of balance disturbance . . . with

disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests," R.

53; *see* R. 55 (citing R. 387); had overwhelmingly normal neurophysical examinations, R. 55–56

(citing R. 370, 377, 384, 443, 452, 455, 458, 461, 464, 467, 471, 477, 481, 484, 505, 537, 550,

561); and routinely "presented with no headache, dizziness, or weakness," R. 56 (citing R. 443,

458, 461, 504, 517–18, 537). *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir.

---

[6] "'Occasionally' means occurring from very little up to one-third of the time" and "should generally total
no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5.

2014) (finding no error where "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility and averred that the entire record had been reviewed"). Patricia does not challenge these findings, Pl.'s Br. 9, which are amply supported by the record. *See, e.g.*, R. 370, 384, 387, 389–90, 406–07, 410–12, 440, 442–43, 446, 458, 461–62, 467, 471, 477, 481, 484, 517–18, 504, 537, 546, 554, 557, 560, 564–65. Patricia also does not explain why ALJ Nagel's postural and environmental restrictions fail to accommodate the "credibly established limitations" related to her vertigo, *Reece*, 2016 WL 658999, at *6, or identify any restrictions ALJ Nagel should have included in the RFC finding. *See McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007) (affirming denial of benefits where plaintiff did "not identify any functional limitations that should have been included in the RFC [finding] or discuss any evidence that would support the inclusion of any limitations"). Accordingly, I find no error with this aspect of ALJ Nagel's RFC determination.

Next, ALJ Nagel's decision to discount Dr. Buckman's extremely restrictive medical opinion "is supported as a matter of fact and law," *Kenne v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018), even if she arguably put too much stock in the "lack of objective evidence" corroborating Patricia's fibromyalgia symptoms, Pl.'s Br. 7 (collecting cases). Medical opinions are statements from "acceptable medical sources," including physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis, functional limitations, and remaining abilities. 20 C.F.R. § 404.1527(a)(1). The ALJ must adequately explain the weight afforded to each medical opinion in the record, taking into account relevant factors like the nature and extent of the provider's treatment relationship with the claimant; how well he or she explained or supported the opinion; the opinion's consistency

with the record as a whole; and whether the opinion pertains to the provider's medical specialty. *See id.* § 404.1527(c).

Patricia argues ALJ Nagel misapplied the "treating physician rule," *see* Pl.'s Br. 5–7, which sets out a special standard for ALJs to evaluate medical opinions from physicians who are "likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's impairments, 20 C.F.R. § 404.1527(c)(2). A treating source's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give a treating-source medical opinion controlling weight, then she must consider the five regulatory factors "to determine what lesser weight should instead be accorded to the opinion." *Brown*, 873 F.3d at 256; *see* 20 C.F.R. § 404.1527(c)(2). A reviewing court "must defer to the ALJ's assignment of weight" among differing medical opinions unless her underlying findings or rationale "are not supported by substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016).

ALJ Nagel's analysis satisfies this "deferential standard of review." *Dunn*, 607 F. App'x at 271. First, she recognized Dr. Buckman had been Patricia's primary-care physician since at least October 2013, *see* R. 55–56, so there is no reason to believe she considered his opinion under the wrong legal standard, *see Winick v. Colvin*, 674 F. App'x 816, 820 (10th Cir. 2017). Second, ALJ Nagel "did not summarily conclude that Dr. [Buckman's] opinion merited little weight." *Sharp*, 660 F. App'x at 257. She explained that the "extreme limitations" were not consistent with Dr. Buckman's own findings that Patricia almost always walked with a normal

gait and endorsed "no tenderness" in her neck, back, shoulders, elbows, wrists, hips, knees, and ankles, R. 57, as well as with other providers' findings that Patricia consistently exhibited normal strength and full range of motion, *see* R. 55–57.

Patricia correctly points out that such evidence is an inherently unreliable way to gauge the intensity, persistence, or functionally limiting effects of a fibromyalgia patient's allegedly disabling musculoskeletal pain. Pl.'s Br. 6–7; *see Knight v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-16-2515, 2017 WL 3088365, at *2 (D. Md. July 20, 2017); *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *8–12 (W.D. Va. June 24, 2014). Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012); *see* R. 599 (diagnostic criteria). "Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). "The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and . . . multiple tender spots, more precisely 18 fixed locations on the body . . . that when pressed firmly cause the patient to flinch." *Id.*; *see also* SSR 12-2p, 2012 WL 3104869, at *3. Otherwise, "physical examinations will usually yield normal results," including full range of motion, no joint swelling, normal muscle strength, and intact neurological reactions. *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003). Thus, many federal courts have "appropriately viewed with skepticism" ALJ decisions that rely on such evidence, or the lack of abnormal objective medical findings, to discredit a treating physician's statements describing the severity and functionally limiting effects of the claimant's fibromyalgia pain. *See, e.g.*, *id.*; *Ellis*, 2014 WL 2862703, at *8–11 (collecting cases).

In Patricia's case, however, ALJ Nagel made clear that she cited the normal physical findings from Dr. Buckman's treatment notes in part to illustrate an internal conflict between Dr. Buckman's "extreme" opinion and his own findings on numerous physical examinations. *See* R. 55–57. For example, Dr. Buckman opined Patricia had "multiple tender points" in her neck and bilateral shoulders, hips, and upper and lower back, arms, hands, legs, and "knees/ankles/feet," R. 593–94; *see also* R. 599, but his treatment notes did not document any tender points at all, R. 55. On the contrary, Dr. Buckman consistently documented "no tenderness" on those same parts of Patricia's body. R. 55–57. ALJ Nagel also found Dr. Buckman's opinion that Patricia's pain was severe enough to "constantly" interfere with her attention and concentration, R. 57 (citing R. 594), at odds with specific mental-status exams showing she had intact concentration and her testimony that she worked for 90 minutes twice a day monitoring children on a school bus, R. 52, 57 (citing R. 72–73). ALJ Nagel acted well within her "discretion to give less weight" to Dr. Buckman's opinion "in the face of [such] persuasive contrary evidence," *Mastro*, 270 F.3d at 178. *See, e.g.*, *Dennison v. Astrue*, No. 5:10cv109, 2011 WL 2604847, at *2 (W.D. Va. July 1, 2011) (noting that the ALJ "may give little weight to a treating physician's conclusory opinions where the physician's own medical notes and the claimant's daily activities are inconsistent with his medical opinion" (citing *Craig*, 76 F.3d at 509)).

Patricia does not identify any reversible error in ALJ Nagel's RFC analysis or "point to *any* specific piece of evidence not considered by the Commissioner that might have changed the outcome of [her] disability claim." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Instead, she urges the Court to reweigh the same medical exhibits that ALJ Nagel and the Appeals Council already considered and to conclude that they should have found her conditions disabling. *See* Pl.'s Br. 7–10 (citing R. 39, 94, 280, 593–98). The Court's role is "to determine

19

whether the ALJ's decision is supported as a matter of fact and law. There were a number of conflicts in the evidence here, and [I cannot] second guess the ALJ in resolving those conflicts." *Keene*, 732 F. App'x at 177. ALJ Nagel's decision and rationale are supported by substantial evidence and therefore the decision should be affirmed.

IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's denial of benefits in this case. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Plaintiff's motion for summary judgment, ECF No. 14, **GRANT** the Commissioner's motion for summary judgment, ECF No. 21, **AFFIRM** the Commissioner's final decision, and **DISMISS** the case from the Court's active docket.

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: April 1, 2020

Joel C. Hoppe
United States Magistrate Judge